## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| SUTHERLAND PRODUCE SALES, INC., <br><br> Plaintiff, <br><br> v. <br><br> HIGH COUNTRY DISTRIBUTION LLC, D & R FOODS LLC dba MOUNTAIN VALLEY DISTRIBUTION and ROY V. COOK, JASON HENDERSON and DANIEL WEBSTER, each individually, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:14-cv-00795-RJS <br><br> Judge Robert J. Shelby |

This case involves a dispute over the sale of produce. Plaintiff Sutherland Produce Sales is a seller of fresh fruits and vegetables, and Defendant High Country Distribution is a buyer. Sutherland contends that over a several-month period in 2014, it sold produce to High Country, but was never paid for it. Sutherland brought various claims against High Country, and now moves for summary judgment on its claims for breach of the Perishable Agricultural Commodities Act (PACA), breach of contract, and breach of fiduciary duty. High Country also seeks summary judgment on Sutherland's PACA claims and its breach of contract claim. For the reasons below, the court grants in part and denies in part Sutherland's Motion for Summary Judgment and denies High Country's Motion for Summary Judgment.

### BACKGROUND

Sutherland is a California-based wholesale seller of produce. It sells various fruits and vegetables, including tomatoes, avocados, limes, cabbage, jalapenos, and tomatillos. High

Country is a Utah-based buyer and dealer of wholesale produce.  It buys produce from suppliers like Sutherland and then sells the produce to retailers.

Beginning around April 2014, High Country entered into several contracts with Sutherland to buy produce.  Typically, Roy Cook, the owner of High Country and a defendant in this case, would initiate the transactions by calling, texting, or emailing an order to Brent Batali, a Sutherland employee.  Batali would procure the requested produce, and a third party would deliver it to High Country or to some other agreed-upon location.  Daniel Webster, a High Country employee and defendant in this case, would generally receive the shipments to High Country at one of High Country's loading docks.  If Webster was unavailable, one of two delivery drivers would sign for the shipments.  According to the invoices provided by Sutherland, High Country then had ten days from delivery to pay for the produce.

Seemingly, all went smoothly for several months.  According to High Country, Sutherland delivered and High Country paid for nearly 50 produce orders between April and July 2014.  But beginning in July, High Country stopped paying for its orders.  Sutherland contends that for two months between July 9, 2014, and September 9, 2014, High Country placed 48 orders that Sutherland fulfilled and High Country received, but for which High Country never paid Sutherland.[1]  During this time High Country repeatedly assured Sutherland that payment was forthcoming.

In November 2014, having received no payment, Sutherland filed the Complaint in this case.  In it, Sutherland asserts claims for breach of PACA, breach of contract, breach of fiduciary duty, and interference with trust assets.  It also seeks an order piercing the corporate veil of D&R

---

[1]     Sutherland admits it did receive partial payment on the initial July 9 order in the amount of $1,230.92, but contends that $17,649.08 is still outstanding on that order.

Foods, a company owned in part by Cook.  After discovery, both parties filed motions for partial summary judgment.

## BURDENS AND STANDARD OF REVIEW

Summary judgment is used to decide pure issues of law and "to isolate and dispose of factually unsupported claims or defenses."[2]  The court will grant summary judgment only if there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law."[3]  Thus, a disputed fact issue will not itself preclude summary judgment if it is either nonmaterial or nongenuine.

Materiality is governed by the legal elements of the parties' claims; a factual dispute is "material" if its resolution is necessary to decide an element of a legal claim.[4]  If a fact is "irrelevant or unnecessary" to decide a claim, any dispute about that fact is not "material" and will not preclude summary judgment.[5]  By contrast, genuineness focuses on the evidence in the record; a factual dispute is "genuine" if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[6]  Thus, if the strength of the evidence on both sides is such that the dispute "may reasonably be resolved in favor of either party," summary judgment must be denied.[7]  But when the evidence, even if material, is "so one-sided" in favor of

---

[2]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[3]     Fed. R. Civ. P. 56(a).

[4]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]     *Id.*

[6]     *Id.* at 249.

[7]     *Id.* at 250.

the moving party, or where a nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.[8]

The moving party carries the initial burden of demonstrating the absence of any genuine dispute of material fact and its entitlement to judgment as a matter of law.[9]  For any material fact, the moving party must show there is no genuine dispute by citing to record evidence, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."[10]  A movant that will bear the burden of persuasion at trial must come forward with sufficient evidence to support every element of every claim, but a movant who will not bear the burden of persuasion need only point out a lack of evidence on an essential element of a claim.[11]

If the moving party makes its initial showing, the burden shifts to the nonmovant, who must set forth specific, admissible evidence from which a rational jury could find for the nonmovant.[12]  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts"; rather, it must come forward with persuasive evidence to support its position.[13]  The court will draw any reasonable inferences from the evidence in the light most favorable to the nonmovant.[14]

---

[8]    *Id.* at 249, 252.

[9]    *Celotex*, 477 U.S. at 323.

[10]   Fed. R. Civ. P. 56(c)(1).

[11]   *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[12]   *Id.*

[13]   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

[14]   *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

**ANALYSIS**

Sutherland moves for summary judgment on its PACA claims, its breach of contract claim, and its breach of fiduciary duty claim.  High Country moves for summary judgment on Sutherland's PACA claims and its breach of contract claim.  The court will first address the PACA claims, followed by the breach of contract and breach of fiduciary duty claims.  The court will then address Sutherland's contention that it is entitled to attorney's fees, costs, and interest.

I.      **PACA Claims**

PACA was enacted in 1930 to regulate the sale of produce in interstate commerce.[15]  The statute imposes strict requirements on buyers and sellers, including regulating the terms on which sellers can sell produce and the time within which buyers must pay.[16]  For sellers who meet PACA's eligibility requirements, the statute provides a cause of action against any buyer who does not make "full payment promptly" upon receipt of goods.

In the early 1980's, after a rising incidence of default among produce buyers, Congress amended PACA to provide even stronger protection for sellers.[17]  It recognized that because of the perishable nature of produce, sellers had to unload their goods quickly and often had no choice but to sell to buyers whose creditworthiness could not be verified.[18]  As unsecured creditors, sellers were often left with no recourse if the buyer defaulted; to the extent the goods

---

[15]     *Am. Banana Co., Inc. v. Republic Nat'l Bank of NY*, 362 F.3d 33, 36 (2nd Cir. 2004).

[16]     7 U.S.C. § 499b(4).

[17]     *Am. Banana Co.*, 362 F.3d at 37 (citing H.R. Rep. No. 98-543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406).

[18]     *Id.*

themselves were still in the buyer's possession, they were likely spoiled, and banks and other creditors stood before sellers in line to recover any of the defaulting buyer's other assets.[19]

To remedy this situation, Congress provided sellers with a powerful tool: a first-in-line security interest in their produce, superior to claims of buyers' other secured creditors.[20]  It did so by adding Section 499e(c), which establishes a trust upon delivery of goods.  Under this provision, the buyer becomes trustee of any delivered goods and must satisfy its debt to the seller with funds from resale of those goods before expending the funds elsewhere.[21]  Importantly, this amended trust provision applies only to sellers dealing in cash or extending short term credit; any seller who extends credit to a buyer for more than 30 days from the date of delivery is not eligible for PACA protection.[22]  Sellers also face other strict eligibility requirements, including providing timely notice of intent to preserve trust benefits.[23]  Those who comply, however, are rewarded with a "highly unusual trust beneficiary status."[24]

It is this highly unusual status as trust beneficiary that Sutherland seeks here.  Sutherland contends that High Country failed to "make full payment promptly" on 48 orders, and argues that it has met the eligibility criteria necessary to recover under PACA's trust provisions.  These provisions require that Sutherland prove: (1) Sutherland is a PACA licensee; (2) Sutherland sold perishable agricultural commodities; (3) High Country was subject to the PACA trust provisions; (4) the commodities traveled in interstate commerce; (5) Sutherland properly preserved its PACA

---

[19]    *Id.*

[20]    *Id.*

[21]    § 499e(c).

[22]    7 C.F.R. § 46.46(e)(2).

[23]    *Id.* § 46.46(f).

[24]    *Am. Banana Co.*, 362 F.3d at 38.

trust rights by providing requisite notice to High Country; and (6) High Country failed to make full payment on at least some of the produce provided by plaintiff.[25]

Sutherland has carried its initial burden of providing evidence to support its entitlement to recover under PACA.  Namely, it has provided the court with the PACA registrations of both parties, copies of invoices, purchase orders, and bills of lading for every order it contends remains unpaid, and copies of correspondence between the parties demonstrating that High Country was receiving produce during the relevant period but was not paying Sutherland.  Thus, the burden shifts to High Country to provide evidence to dispute one or more elements of Sutherland's claims.

High Country argues that Sutherland cannot recover under PACA for two reasons: (1) some or all of the produce from the 48 disputed invoices was never delivered or was listed at a higher price than agreed upon; and (2) even if the produce was delivered, Sutherland is not eligible for PACA trust protection because it extended payment terms beyond the 30-day regulatory limit.[26]  The court will address each argument in turn.

### A.  Delivery & Price Terms

High Country first argues that Sutherland hasn't established that all 48 disputed orders were actually delivered, and it contends that the invoices for orders that were delivered improperly state the price terms agreed upon by the parties.  As to delivery, this element is certainly material, as PACA protection applies only to "[p]erishable agricultural commodities

---

[25]    *See Spada Props., Inc. v. Unified Grocers, Inc.*, 38 F. Supp. 3d 1223, 1230 n.2 (D. Or. 2014) (citing § 46.46).

[26]    High Country initially argued in the alternative that Sutherland forfeited entitlement to PACA protection by failing to provide a prompt accounting within 24 hours, but it later "conced[ed] that the 24 hour accounting requirement is only applicable to buying brokerage transactions."  Dkt. 81 at iii.

*received* by a . . . dealer."[27]  But the parties dispute what evidence is necessary to prove delivery. Sutherland contends that the evidence it has provided—invoices, bills of lading, and purchase orders for all 48 disputed orders—is sufficient to prove delivery.  Indeed, it argues that where, as here, there is no evidence the buyer ever objected to the invoices, the invoices alone are sufficient, even absent the attendant purchase orders and bills of lading.  High Country disagrees. According to High Country, only signed bills of lading will suffice.  Because some of Sutherland's bills of lading are unsigned, it argues, Sutherland has not demonstrated delivery of all disputed orders.

It is conceivable that in some cases, the lack of a signed bill of lading for every invoice could create a genuine dispute on the element of delivery.  But given the dearth of evidence High Country has provided to defeat summary judgment, the court concludes that in this case, the 48 invoices, combined with the lack of any contemporaneous objection to the invoices by High Country, satisfy Sutherland's burden to demonstrate delivery of the disputed goods.  High Country's evidence disputing delivery consists primarily of the affidavits of Roy Cook (the owner of High Country) and Daniel Webster (an employee of High Country).  The two affidavits are nearly identical, and in relevant part, state only that:

- "High Country did not receive delivery of some or all of the produce reflected on the invoices."[28]

- "High Country has been unable to verify its receipt of the items that plaintiff purports to have sold or delivered."[29]

---

[27]    7 U.S.C. § 499e(c)(2) (emphasis added).

[28]    Dkt. 77-1 at 2.

[29]    *Id.* at 3.

High Country makes no effort in its affidavits or in its briefing to point to any one of the 48 orders it contends were not delivered.  Indeed, the most specific of High Country's representations is a general reference to one instance when it contends goods weren't delivered and one instance where goods were delivered but improperly billed:

- "Plaintiff's delivery driver was involved in a serious accident on I-15.  The shipment was lost or destroyed.  It was never delivered to High Country.  Nevertheless, plaintiff issued an Invoice to High Country demanding payment for the undelivered load."[30]

- "With respect to a few deliveries under the Tomato Contract, Sutherland . . . provided to High Country medium large size tomatoes rather than extra large romas, subject to the express agreement that High Country's price would be $1.00 per case less. . . . [But] plaintiff overcharged High Country for deliveries of roma tomatoes."[31]

It's unclear what orders High Country is referring to because nowhere in its briefing does it cite an invoice number, or even a date for that matter.

By contrast, in support of its argument that the goods *were* delivered, Sutherland provided a chart listing the invoice number and date of all 48 invoices it contends remain unpaid.[32]  It also provided a copy of each invoice and of the emails forwarding each invoice to High Country.  As discussed, given the state of the record, this is likely sufficient to demonstrate delivery.

But that's not all Sutherland provided.  For every invoice, it also provided a bill of lading showing the date of delivery and what goods were delivered.[33]  As High Country points out, not all of the bills of lading are signed by a High Country representative.  But the import of that is

---

[30]      Dkt. 74 at xv.

[31]      Dkt. 81 at xii.

[32]      Dkt. 76-7.

[33]      Dkts. 76-6, 76-9, 76-10, 76-11.

not entirely clear; apparently, High Country asked that many of the orders be delivered to a third-party warehouse, or to a retailer directly, in which case a High Country employee might never see the goods, much less sign for them on delivery.  Regardless, the fact that Sutherland has provided a bill of lading drafted by a third party for every disputed invoice, signed or not, is further evidence of delivery.

Additionally, for each invoice Sutherland has provided corresponding purchase orders that were drafted by High Country *after* delivery of the goods, which suggests that the purchase orders accurately reflect what was actually delivered.  High Country now contends that the purchase orders it drafted "are erroneous and do not reflect actual contract terms." It argues that Cook's daughter, Mary Ruiz, prepared the purchase orders at Batali's direction based on the invoices High Country received from Sutherland, and that Ruiz never verified with Cook that the items were actually delivered.  Perhaps if the purchase orders were Sutherland's only evidence of delivery, that allegation would be sufficient to create a genuine issue of material fact.  But the trifecta of the invoices (drafted by Sutherland), the purchase orders (drafted by High Country), and the bills of lading (drafted by third parties), the terms and dates of which all match up, provides such compelling evidence that High Country's bare assertion that the purchase orders "are erroneous and do not reflect actual contract terms," without any explanation or supporting evidence, is insufficient to create a genuine issue of fact for trial.  No reasonable jury could rely on High Country's unsupported, general statements to find against Sutherland on the delivery element of Sutherland's claim.

This conclusion is further bolstered by the running record of the parties' dealings, as memorialized in several months of text messages between Cook and Batali.  That record provides evidence of High Country's continuous placement of orders, its repeated promises that

10

payment was forthcoming, and an utter lack of any mention that the invoices Sutherland was regularly sending to High Country reflected goods that weren't actually delivered.  High Country's "failure promptly to complain as to the terms set forth in [the] invoice[s] is considered strong evidence that they were correctly stated," and similarly, that the goods were actually delivered.[34]  Given this evidence, High Country has failed to raise a genuine issue of fact on the issue of delivery.

High Country's second argument—that Sutherland has not established that the invoice price terms were correct—fails to raise a genuine issue of fact for the same reason.  The purchase orders that High Country itself drafted match the pricing on the invoices provided by Sutherland.  High Country again argues, in essence, that the purchase orders were being drafted by Ruiz without Cook's oversight, so they don't reflect the actual terms Cook agreed to.  But as discussed, the months of text messages between Cook and Batali demonstrate that Cook was well aware of the debt that was accruing, and at no point did he question the prices or quantities of produce Sutherland was delivering, which "is considered strong evidence that they were correctly stated" on the invoices.[35]  And the notion that Cook placed the orders but never saw the invoices is not supported by the record.  Webster admitted in his deposition that "a lot of th[e] invoices are sent . . . directly to [Cook]."[36]  Indeed, every invoice from Sutherland was emailed to Cook's personal email address.[37]  In light of this evidence, the generalized assertion in Cook's and Webster's declarations that "the Invoices often reflected price terms different than those

---

[34]     *Pemberton Produce, Inc. v. Tom Lange Co., Inc.*, 42 Agric. Dec. 1630, 1636 (USDA 1983).

[35]     *George W. Haxton & Son v. Adler Egg Co.*, 19 Agric. Dec. 218, 224–25 (USDA 1960).

[36]     Dkt. 76-1 at 22.

[37]     *Id.* at 68; Dkt. 76-10.

agreed among High Country and Plaintiff," without reference to any particular invoice or shipment, is not sufficient to raise a triable issue of fact about whether the invoices properly state the price and quantity terms.

### B. 30-Day Payment Term

High Country also contends that even if the goods were delivered and the price terms properly stated on the invoices, Sutherland has not met PACA's requirement that a seller must sell goods only on a cash or short-term credit basis.[38]  During PACA's enactment, Congress expressed a desire that the statute apply only to sellers who extend credit on a short-term basis.[39]  This was in part because PACA was targeted at "protect[ing] small dealers who require prompt payment to survive," and in part with an eye toward quickly weeding out defaulting buyers and suspending their license so as to minimize the greater financial impact of any eventual bankruptcy.[40]  The Secretary of Agriculture addressed these goals by promulgating regulations establishing a default payment term of 10-days after delivery.[41]  The regulations allow the parties to extend the default term, but only up to 30 days after delivery.[42]  High Country contends that Sutherland disqualified itself from PACA protection by agreeing to extend the payment term up to 60 days, beyond the 30-day regulatory maximum.

In response, Sutherland points to another provision in the regulations: the requirement that any extension of the default payment term be put in "writing before entering into the

---

[38]     *See* 7 C.F.R. § 46.46(e).

[39]     *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002); *see also* H.R. REP. NO. 98–543, at *6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410.

[40]     *Patterson Frozen Foods*, 307 F.3d at 669.

[41]     § 46.2(z).

[42]     *Id.* § 46.46(e)(2).

transaction."[43]  Neither party contends there was any written agreement to extend the default payment term.  Indeed, the only written reference to a payment term is the statement on the face of every invoice representing that the payment term was "10 days."  Rather, High Country contends the parties "orally agreed that High Country would have sixty days from delivery to make payment."[44]  Alternatively, it argues that even if there was no oral agreement, the parties' course of dealing demonstrates an implied agreement to extend the payment term beyond the 30-day limit.

Sutherland argues that even if this is true, it is of no import because extensions to the default payment term must be in writing.  Because any alleged extension between the parties was not in writing, Sutherland contends, the default 10-day term appearing on the face of the invoices governs.  High Country responds by arguing that the writing requirement does not apply in this instance.  According to High Country, it would be contrary to the intent of the statute to invoke the writing requirement here to save a seller who has otherwise disqualified itself from PACA protection by extending payment terms (albeit orally or impliedly) beyond the 30-day deadline.

The resolution of this issue comes down to determining the reach of the writing requirement.  It's fairly clear that the requirement can be invoked by a buyer as a defense against a charge of late payment.[45]  That is, if parties orally agree to a 7-day payment term and a seller sues for late payment on day eight, the buyer can invoke the writing requirement as a defense— because the 7-day term wasn't reduced to writing, the default 10-day term still governs.

---

[43]      *Id.* § 46.46(e)(1).

[44]      Dkt. 74 at viii.

[45]      *See, e.g.*, *In re: The Caito Produce Co.*, 48 Agric. Dec. 602, 610 (USDA 1989) (Because agreement to extend payment term was not in writing, default term applied and buyer therefore did not make "full payment promptly.").

Less clear is whether a *seller* may invoke the writing requirement as a defense against a charge that it disqualified itself from PACA protection by orally (or impliedly) agreeing to a payment term of greater than 30 days.  On the one hand, as discussed, the regulations state that any departure from the default 10-day term must be put "in writing before entering into the transaction," suggesting that an oral agreement to accept payment more than 30 days after delivery would have no effect under PACA and would not disqualify a seller from PACA protection.  But on the other hand, this interpretation would be in tension with Congress's goal of extending PACA protection only to sellers issuing short term credit: a seller could orally agree to issue credit well beyond the thirty-day limit but retain PACA protection so long as it never reduced the agreement to writing.

The question of how to resolve this tension has been a matter of some dispute in the courts.  The Tenth Circuit has not addressed the issue, and the circuits that have are split.  The majority of courts have adopted a broad view of the writing requirement, holding that a non-written extension of the default payment term has no effect under PACA.  Under this interpretation, a buyer who is in default of an orally-agreed-upon term can use the writing requirement as a shield against a charge that the buyer did not promptly pay, as explained above, but so can a seller use the requirement as a shield against PACA disqualification when it orally extends the payment term beyond the 30-day maximum.

The Eighth Circuit endorsed this interpretation in the early '90s in *Hauser's Foods*, reasoning that "[t]he statute and regulations clearly contemplate that the parties must set forth such agreements [extending the default payment term] in writing to be effective."[46]  The court noted that "it would be incongruous to disregard oral agreements for purposes of enforcing

---

[46]     *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781 (8th Cir. 1991).

PACA" against a defaulting buyer, but then to "recognize them for the purpose of voiding the sellers' protection under the trust."[47]  The Fifth and Seventh Circuits have adopted this approach as well.[48]

A minority of courts have adopted a narrower view of the writing requirement, holding that the requirement exists as a shield for defaulting buyers but not for disqualified sellers.  In other words, to return to the example previously discussed, under this interpretation, a seller who enters into an oral agreement to a 7-day payment term still cannot sue a buyer for failure to promptly pay on day eight because any agreement to alter the 10-day default must be in writing. But the writing requirement would not save a seller from PACA disqualification if the seller orally agreed to extend the payment term, for example, to 40 days, beyond the 30-day regulatory maximum.

This was the interpretation adopted by the Second Circuit in 2004 in *American Banana*.[49] The court there recognized the requirement that "[p]arties who elect to use different times of payment . . . must reduce their agreement to writing before entering into the transaction," but declined to "interpret [that] regulation to mean that parties are free to enter into agreements that violate PACA's prompt payment rules as long as they do not reduce their agreements to writing."[50]  Citing Congress's generalized statement that it "does not intend the trust to apply to any credit transaction that extends beyond a reasonable period," the court concluded that where

---

[47]      *Id.* at 782.

[48]      *Bocchi Ams. Assocs., Inc. v. Commerce Fresh Mktg., Inc.*, 515 F.3d 383, 390 (5th Cir. 2008); *Patterson Frozen Foods, Inc.*, 307 F.3d at 671.

[49]      *See Am. Banana Co.*, 362 F.3d at 46–47.

[50]      *Id.* at 46.

"a seller agrees—orally or in writing—to a payment period exceeding thirty days, it forfeits trust protection."[51]

At least two recent district court decisions have taken this a step further, concluding that a party's course of dealings—even absent evidence of a written or oral agreement—could constitute evidence of an implied agreement to extend payment terms beyond thirty days that results in trust protection forfeiture.  In 2011, the Southern District of New York found a triable issue of fact about whether a seller had forfeited PACA protection by improperly extending payment terms based on evidence showing that over the course of 1,139 orders between the parties, the seller paid the buyer within 30 days less than 3% of the time.[52]  The court determined that "[a] reasonable fact finder could conclude that there was an established course of dealings between the parties by which plaintiff agreed to accept payment more than 30 days after receipt of the produce," which would "remove plaintiff from the protections afforded by a PACA trust."[53]

A few years later the District of Oregon came to a similar conclusion.[54]  There, the buyer defaulted and the parties agreed to a repayment plan by which the parties would continue doing business and any future payments would go to the oldest outstanding debt.[55]  The court

---

[51]    *Id.* at 44, 47.  The court also determined that a *post*-default agreement to enter into a debt-repayment plan that extended beyond 30-days forfeited PACA protection.  *Id.* at 45.  The UDSA in 2011 amended the regulations to clarify that this type of plan would not forfeit a seller's PACA rights.  7 C.F.R. § 46.46(e)(3).

[52]    *A & J Produce Corp. v. City Produce Operating Corp.*, No. 10 Civ. 5610(PKC), 2011 WL 6780614, at *4 (S.D.N.Y. Dec. 23, 2011).

[53]    *Id.* at *5.

[54]    *See Spada Props., Inc. v. Unified Grocers, Inc.*, 121 F. Supp. 3d 1070, 1087 (D. Or. 2015).

[55]    *Id.* at 1076.

concluded that the arrangement "virtually guaranteed that the buyer [could not] meet PACA compliant net-10 or net-30 payment terms as to subsequent shipments," because any payment by the buyer would go first toward already-outstanding debt.[56]  According to the court, this "constitutes a credit arrangement permitting a buyer to make payments that are not considered prompt by Congress and the USDA."[57]

Thus, the circuits are split on whether an oral agreement to extend payment terms beyond thirty days forfeits PACA protection for sellers; the Second Circuit says it does, the Fifth, Seventh and Eighth Circuits say it does not.  And some district courts have taken the Second Circuit's holding even further by concluding that course of dealing alone can forfeit PACA protection.  High Country argues both that the parties orally agreed to extend the payment terms beyond 30 days, and, alternatively, that they implicitly agreed to extend the terms because their course of dealing demonstrates that early in the engagement High Country routinely paid Sutherland beyond 30 days and Sutherland nonetheless continued doing business with High Country.  These agreements, if proven, would likely forfeit PACA protection under recent New York and Oregon district court decisions (because under these decisions, course of dealing alone is sufficient) and under existing Second Circuit Precedent (as *American Banana* held that oral agreements may forfeit PACA protection).  But under the Fifth, Seventh, and Eighth Circuits' precedents, they would not (because those circuits require a written payment extension before the trust protection is forfeited).

In the court's view, the Fifth, Seventh, and Eighth Circuits have the better interpretation. Both the statute and the applicable regulations go out of their way to make clear that a seller will

---

[56]     *Id.* at 1087.

[57]     *Id.*

17

be eligible for trust protection only if it uses the 10-day default term or modifies that term in writing to some other term of 30 days or fewer.[58]  And the regulations frame these requirements as "eligibility requirements," suggesting they apply not only in the context of  determining whether payment was prompt, but also in the context of determining, on the front end, whether a seller is eligible for PACA protection.

The court concedes that PACA's legislative history reveals a reluctance to provide trust protection to "any credit transaction that extends beyond a reasonable period," and that a decision to recognize only *written* agreements to extend the payment term could run contrary to this intent by granting trust protection to a seller who has agreed orally or impliedly to extend credit beyond the 30-day maximum.[59]  But the parties aren't bound by PACA's legislative history, they are bound by its statutory and regulatory language.  And that language makes clear that to be "eligible for trust benefits," a seller must elect to use the default 10-day term or must "reduce . . . to writing" an agreement to a term of not more than "30 days after receipt and acceptance of the commodities."[60]  Because High Country has provided no evidence of a written agreement to extend the payment term beyond the 30-day limit, it has not raised a triable issue of fact on Sutherland's PACA eligibility.

---

[58]     *See* 7 U.S.C. § 499e(3) (tying notice deadline to either the ten-day default term or "such other time by which payment must be made, as the parties have expressly agreed to in writing"); 7 C.F.R. § 46.46(e) (noting that to be "eligibl[e] for trust benefits," parties must use default 10-day term or "must reduce their agreement [to another payment term] to writing before entering into the transaction").  The regulations do recognize oral or implied agreements in the context of *post-default* agreements.  7 C.F.R. § 46.46(e)(3) (allowing a seller to "agree[] *in any manner* to a schedule for payment of the past due amount" (emphasis added)).  But this demonstrates only that the Secretary of Agriculture knows how to allow oral or implied agreements when it pleases, and it has made clear that agreements made "*before* entering into the transaction" must be "reduce[d] . . . to writing."  *Id.* § 46.46(e)(1) (emphasis added).

[59]     H.R. Rep. No. 98-542, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410.

[60]     7 C.F.R. § 46.46(e).

## II.        Breach of Contract Claim

Sutherland also moves for summary judgment on its breach of contract claim.  In Utah, a breach of contract claim requires a plaintiff to show: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) breach of the contract by the other party; and (4) damages.[61]  As with its PACA claim, Sutherland has met its initial burden of demonstrating the absence of any genuine dispute of material fact and its entitlement to judgment as a matter of law on this claim; it has provided invoices, purchase orders, and bills of lading, among other evidence, demonstrating that over the course of several months High Country ordered produce from Sutherland, Sutherland fulfilled those orders, and High Country failed to pay Sutherland.

Thus, the burden shifts to High Country to demonstrate the existence of a genuine issue of a material fact on this claim, or if no such issue exists, to show that Sutherland is not entitled to judgment as a matter of law based on the undisputed facts.  High Country contends that summary judgment in Sutherland's favor is inappropriate for three reasons: (1) Sutherland cannot show delivery and acceptance of all the goods; (2) the prices and quantities on Sutherland's invoices are incorrect; and (3) prior breaches by Sutherland excuse High Country's obligation to pay.  The court will address each in turn.

High Country's first and second arguments—that Sutherland did not prove delivery of the goods or accuracy of the invoices—were addressed in the previous section related to Sutherland's PACA claim and will not be rehashed here.  In short, the invoices, as well as the bills of lading and purchase orders, satisfy Sutherland's initial burden.  And High Country's vague and conclusory allegations, coupled with its failure to cite any instance where it objected to nondelivery or improper price terms, do not raise a triable fact issue on these elements.

---

[61]        *Blair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

High Country's third argument is that prior breaches by Sutherland excuse performance of the contract by High Country.  The notion that prior breach can excuse performance is correct as a matter of law.  But High Country's briefing on this point is altogether lacking in detail.  The entirety of High Country's argument is:

> Plaintiff breached its contract with High Country by, among other things, (a) failing to send bills of lading or invoices with shipments, (b) sending its invoices unreasonably late, (c) seeking to collect prices greater than those agreed prior to delivery, (d) failing to promptly account to High Country, (e) seeking to collect from High Country for goods never delivered, including the shipment dumped on I-15, (f) seeking to collect from High Country for goods High Country did not order, but merely accepted on an "open contract" as a favor to Batali, (g) failing to afford High Country the agreed credit terms, and (h) otherwise acting in a manner inconsistent with High Country's justified expectations.

Notably, this argument is unsupported by any citation to record evidence, which is expressly required in order to create a genuine issue of material fact.[62]  Moreover, High Country has the burden of providing specific, admissible evidence from which a rational jury could find in its favor.[63]  Nothing within High Country's argument is specific, and no reasonable jury could rely on it to find for High Country.  Indeed, High Country's argument does nothing more than create "some metaphysical doubt as to the material facts," which is insufficient at this stage.[64]  Even construing all evidence in the light most favorable to High Country, as the court must, High Country simply has not sufficiently fleshed out its argument or provided adequate evidence to create a genuine issue of fact on the question of whether Sutherland breached the contract.  Sutherland is therefore entitled to summary judgment on its breach of contract claim.

---

[62]     Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of material in the record.").

[63]     *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[64]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

### III.     Breach of Fiduciary Duty Claim

Sutherland also seeks summary judgment on its claim for breach of fiduciary duty.  It contends not only that High Country is liable to Sutherland for the entire outstanding balance, but that Cook and Webster are personally liable as well.  According to Sutherland, PACA imposed on Cook and Webster a fiduciary duty over any money High Country received from resale of Sutherland goods, and they breached their duty by not using that money to pay the amounts owed to Sutherland.

PACA does not explicitly impose a fiduciary duty on a buyer's employees, but because it creates a "trust," courts have routinely turned to general trust principles to conclude that certain employees of a buyer can become trustees with fiduciary duties.[65]  Under these principles, liability attaches first to the corporation itself, but where the assets of the corporation are insufficient to satisfy PACA liability, individuals may be personally liable to the extent they had a role in causing the corporate trustee to breach the trust.[66]  Thus, the issue of personal liability under PACA boils down to two questions: (1) whether an individual was in a "position to control trust assets"; and (2) whether he breached his fiduciary duty to preserve those assets.[67]

The court need not address the first question because the second is dispositive of this claim.  Even assuming Cook and Webster were in a position to control trust assets, to show they breached a fiduciary duty to preserve those assets Sutherland must demonstrate that "the assets

---

[65]     *See Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc.*, 188 F. Supp. 3d 1097, 1110 (D.N.M. 2016) (collecting cases).

[66]     *Goldman-Hayden Co., Inc. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000).

[67]     *See Fed. Fruit & Produce Co. v. Liborio Mkts. No. 9, Inc.*, No. 12-cv-1145-WJM-BNB, 2013 WL 4838914, at *3 (D. Colo. Sept. 10, 2013).  There is no 10th Circuit authority on the issue of personal liability under PACA.  But several other circuits have adopted this two-part test, as have district courts in this circuit.  *Id.* (listing cases).  The court therefore follows that lead.

of the licensed . . . dealer . . . are insufficient to satisfy the PACA liability."[68] Sutherland provided evidence that High Country failed to pay its bills, but it has provided no evidence that High Country is unable to pay its bills. Indeed, there is no evidence in the record demonstrating High Country's insolvency. Thus, whether High Country has assets sufficient to satisfy its PACA liability is a genuine issue of fact that precludes summary judgment on Sutherland's breach of fiduciary duty claim.

### IV. Attorney's Fees, Interest, and Costs

Sutherland asserts in its complaint and briefly in its summary judgment papers that it is entitled to attorney's fees, interest, and costs. PACA itself does not provide for fees, interest, or costs, but it does provide for recovery of "sums owing *in connection with*" the sale of produce, which courts have construed to include fees, interest, and costs if the underlying contract provides for such relief.[69] Sutherland contends that the parties' contracts included a right to fees, interest, and costs because the following fine print was included at the bottom of each invoice: "Delinquent accounts are subject to finance charges of 1.5% per month. In the event legal actions is commenced to collect the sums due under this invoice, the prevailing party shall be enabled to recover all court costs and reasonable attorney fees incurred thereby as damages, in addition to any principal balance then remaining due."

It is undisputed that Sutherland's invoices were sent *after* delivery, and High Country seizes on this fact to argue that the aforementioned language never became part of the parties' contracts. Before Utah's adoption of the Uniform Commercial Code (UCC), courts facing this

---

[68]    *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 707 (2d Cir. 2007) (quoting *Golman-Hayden Co., Inc. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000)).

[69]    *See, e.g., Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*, 307 F.3d 1220, 1222 (9th Cir. 2002); *Coosemans Specialties,* 485 F.3d at 709.

situation applied common law to determine whether there had been a meeting of the minds on provisions included only in invoices delivered after the fact.[70]  The UCC, however, "departs from the common law . . . in that it construes additional or different terms contained in the acceptance as proposals to modify the contract which, as between merchants, become part of the contract unless . . . they materially alter it."[71]  An additional term materially alters a contract if it "results in surprise or hardship if incorporated without the express awareness by the other party."[72] "Surprise" is more than "raised eyebrows"; it must be established that a reasonable merchant would not have consented to the additional term.[73]  "Hardship," on the other hand, can be shown when the term "creates or allocates an open-ended and prolonged liability."[74]  The nonassenting party carries the burden of proving surprise or hardship, as the presumption under the UCC is that non-objected-to clauses are included in contracts absent a showing of material alteration.[75] Thus, under Utah law, High Country has the burden of showing that the interest, fees, and costs provisions in Sutherland's invoices were surprising—i.e. a reasonable merchant wouldn't have approved—or they caused hardship—i.e. they created an open-ended and prolonged liability.

Concerning interest provisions, the UCC commentary expressly indicates that "a clause providing for interest on overdue invoices" is an example of a term that does not materially alter

---

[70]   *See, e.g.*, *B & R Supply Co. v. Bringhurst*, 503 P.2d 1216, 1217 (Utah 1972).

[71]   *Johnson Tire Serv., Inc. v. Thorn, Inc.*, 613 P.2d 521, 523 (Utah 1980).

[72]   *Am. Ins. Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1189 (10th Cir. 1992).

[73]   *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 224 (2d Cir. 2000).

[74]   *Id.* at 226.

[75]   *Am. Ins. Co.*, 978 F.2d at 1192 n.9.

a contract and is therefore incorporated absent timely objection.[76]  Courts are in accord.[77]  None of the facts of this case suggest that this interest provision would be so surprising or induce such hardship as to warrant departure from the UCC commentary and weight of prior authority.

The same cannot be said of attorney fees.  In *Johnson Tire Service*, the Utah Supreme Court concluded that "the addition of a provision for attorneys' fees alters the offer materially and thus does not fall within the 'additional or different terms' which the statute renders acceptable by mere silence on the part of the offeror."[78]  This on-point authority might seem to end the matter, but the Tenth Circuit has cautioned against blindly applying another court's holding as to what might constitute a material alteration because determining whether a term would result in surprise or hardship "depends on the unique facts of every case."[79]  To that end, the court does not see any material difference between *Johnson Tire Service* and this case that would render an attorney fee modification surprising there, but not here.  As such, the attorney fee provision did materially alter the contracts and therefore did not become a part of them.

As to the cost provision, there does not appear to be Tenth Circuit or Utah state court authority on point, nor does the UCC commentary address such a provision.  Thus, the court relies solely on the parties' arguments about why the provision does or does not constitute a surprising or hardship-inducing material alteration.  High Country has not expressly argued why this provision should not be included in the contracts, and because High Country bears the

---

[76]    Utah Code Ann. § 70A-2-207 cmt. n.5 (West).

[77]    *See Monarch Nutritional Laboratories, Inc. v. Maximum Human Performance, Inc.*, No. 2:03CV474TC, 2005 WL 1683734, at *7 (D. Utah July 18, 2005) (listing cases).

[78]    *Johnson Tire Serv.*, 613 P.2d at 523.

[79]    *Am. Ins. Co.*, 978 F.2d at 1189.

burden of proving a new term constitutes a material change, the court construes the cost provision as a nonmaterial change that was incorporated into the contracts.[80]

In conclusion, the court finds that the interest and cost provisions in Sutherland's invoices did not materially alter the parties' agreement, and were therefore adopted when High Country failed to object, but it determines that the attorney fee provision did materially alter the agreement and thus is not enforceable.

## CONCLUSION

High Country's Motion for Summary Judgment[81] is denied.  Sutherland's Motion for Summary Judgment[82] is granted in part and denied in part.  Its Motion for Summary Judgment on Claims One, Two, and Three (the PACA and breach of contract claims) is granted.  Its Motion for Summary Judgment on Claim Four (the breach of fiduciary duty claim) is denied. Sutherland's request to include in the judgment interest and costs, as prescribed in its invoices, is granted.  Its request to include attorney fees is denied.

SO ORDERED this 28th day of February, 2017.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[80]    *See, e.g.*, *Ruby Robinson Co., Inc. v. Kalil Fresh Mktg., Inc.*, No. H-08-199, 2009 WL 3378419, at *2 (S.D. Tex. Oct. 16, 2009) (Where "[d]efendants ha[d] not claimed any of the[] exceptions[,] . . . claimants ha[d] established a contractual right to attorneys' fees based on the language of the invoices.").

[81]    Dkt. 74.

[82]    Dkt. 75.